**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ROGER D. WOOLEYHAN, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CAPE HENLOPEN SCHOOL DISTRICT, | : | NO.   10-153 |
| et al., | : | |
| | : | |
| Defendants. | : | |

**Baylson, J.**                                                                               **May 17, 2011**

<u>**MEMORANDUM REGARDING MOTIONS FOR SUMMARY JUDGMENT
ON INDIVIDUAL CAPACITY CLAIMS**</u>

This action arises out of Defendant Cape Henlopen High School teacher Amanda R.

Jester's ("Jester") accusation that Plaintiff Roger D. Wooleyhan ("Wooleyhan"), a student at the

school, offensively touched her.  Wooleyhan asserts several civil rights and state-law claims

against Jester and various other public officials for their handling of the accusation.

All individual Defendants seek summary judgment.  After careful consideration of the

parties' briefing, supplemental letters to the Court, and an exhaustive review of the record, as

well as oral argument, the Court is prepared to rule on the motions.  For the reasons that follow,

certain defendants – William Matt ("Matt"), John Yore ("Yore"), Dianne Mrazeck ("Mrazeck"),

Robert Maull ("Maull"), and John Walsh ("Walsh") – are entitled to summary judgment on

Wooleyhan's individual capacity claims, while the remaining defendants – Jester and Lisa White

("White")[1] – are only entitled to partial summary judgment.[2]

---

[1]          At the time Wooleyhan initiated this litigation, White was known as Lisa
Coverdale.  Since that time, she has married and now goes by the name Lisa White.  The Court

# I.     Factual and Procedural History

## A.     Factual Background

### 1.     Wooleyhan's Version of Events

On Friday, October 24, 2008, Wooleyhan and his then-girlfriend, Marie Natalie Pineda ("Pineda"), were standing in a hallway of the Cape Henlopen High School (the "School"). At the time, Wooleyhan was an eighteen-year-old senior. Wooleyhan and Pineda were having a conversation when Jester approached and instructed them to go to class. (Jester App., ECF No. 182, at 18.) According to Wooleyhan, Jester physically separated him from Pineda. Wooleyhan denies elbowing Jester. (Sealed App., ECF No. 96, at 111.)

Wooleyhan contends he proceeded to class and Maull and another administrator then removed him from class. (School Defs. App., ECF No. 181, at 2.) He contends Maull advised him he was being suspended and escorted him to the main office. (Id.) Once in the office, Wooleyhan alleges that Jester commented, "[A]nother one down, I got 'em dropping like flies." (Sealed App. at 112.)

In the office, Wooleyhan sat seven to twelve feet away from an open office as Jester described and demonstrated the alleged elbowing. (School Defs. App. at 12.) Wooleyhan admits he was the subject of the conversation and that he could hear some, but not all, of the conversation. (Id. at 11.) Thereafter, Wooleyhan testified that Maull told him he was being

will refer to her by her married name.

[2]     As explained in further detail below, the Court cabined discovery into two parts, the first relating to the individual Defendants' liability and the second to the institutional Defendants' liability. The instant motions for summary judgment concern the liability of the individual Defendants for Wooleyhan's individual capacity claims.

suspended and asked him to complete a written statement regarding "what happened upstairs." (Id.)  Although Wooleyhan testified he did not know why he was in the office or of what he was accused, he indicated in this written statement that "I guess she thought that I must have bumped into her arms."  (Id. at 11-13; see id. at 32.)  Wooleyhan does not mention meeting with Yore on October 24.  (See Sealed App. at 111-14.)

Matt arrested Wooleyhan and took him to the local State Police facility for fingerprinting and processing.  (Id. at 114; Pl.'s Matt App., ECF No. 186, at 6.)  Following Wooleyhan's arrest and booking, he returned to the School, at which time Maull informed him that the School had suspended him for three days.  (School Defs. App. at 14.)  At this meeting, Wooleyhan admits that Maull gave him "the whole spiel" of why he was being suspended, he did not request to see any evidence against him, and he declined the opportunity to comment.  (Id. at 14, 22.)[3] Wooleyhan testified that it did not seem his version of the events mattered.  (Id. at 22.)

Wooleyhan's parents met with school administrators more than once, and Wooleyhan attended one of those meetings.  (Id. at 23; Pl.'s School Defs. App., ECF No. 185, at 41.)  After these meetings, the School Review Committee met on Wednesday, October 29 and recommended a ten-day suspension.  (School Defs. App. at 54.)  Yore reduced it to three days and Wooleyhan returned on Thursday, October 30.  (Id.)  Ultimately, Wooleyhan was out of school for three and one-half school days – the remainder of Friday and then Monday through Wednesday.  Wooleyhan contends Yore failed to comply with the School's code of conduct throughout the disciplinary process.

---

[3]     Maull contradicted Wooleyhan's recollection, testifying in a deposition that he did not speak with Wooleyhan after Wooleyhan returned from the police station.  (Maull Dep. at 73:24-74:4 (on file with the Court).)

On February 3, 2009, Wooleyhan's criminal charges proceeded to trial in the Justice of the Peace Court. (See generally Sealed App. at 26-105.) Matt acted as the prosecutor. (Id.) Before trial and at the close of the State's case, Wooleyhan's counsel moved to dismiss for lack of probable cause.[4] (See id. at 29-31, 78.) The Justice of the Peace denied both motions, finding Jester's testimony alone established probable cause to proceed. (Id. at 32, 80-81, 104.) Ultimately, the Justice of the Peace found Wooleyhan not guilty, concluding the State had not met its burden of demonstrating guilt beyond a reasonable doubt. (Id. at 104.)

### 2. Jester's Version of Events

According to Jester, Wooleyhan and Pineda were "making out" in the hallway and ignoring her and Walsh's instructions to proceed to class. She then approached the students with her arms in front of her and her hands together. (Jester App. at 52-53.) She placed her arms in between the students to separate them. (Id.) At this point, Jester claims Wooleyhan intentionally elbowed her in the chest. (Id. at 71-72.)

With the help of Maull and a hall monitor, Jester escorted Wooleyhan to the school's main office. (Id. at 35; School Defs. App. at 9.) Jester reported the incident to Yore and Matt. (Pl.'s School Defs. App. at 9.) She then learned Wooleyhan's name from a hall monitor and Pineda's name from Walsh. (Id. at 10.) When she returned to the office, she phoned Pineda's mother to advise her of her daughter's behavior. (Id.)

Jester submitted three disciplinary referrals, one of which served as a written report of the

---

[4] Wooleyhan's counsel also submitted a letter and a video of the incident to Deputy Attorney General Casey Ewart ("Ewart") to request the State drop the charges. Ewart responded, with copy to Matt, that the video of the incident is inconclusive and that the matter should proceed to trial to resolve the conflicting accounts. (Matt App. at 35.)

incident to Matt. (Jester App. at 140-42; <u>see</u> School Defs. App. at 47.) She filed a referral (1) for Wooleyhan's and Pineda's alleged open display of affection in violation of the School's code of conduct, (2) for Wooleyhan's failure to comply with the teachers' instructions, and (3) for the elbowing incident. (Jester App. at 140-42.) Jester listed Walsh as a referring teacher for each of the three referrals, but acknowledges she never secured his consent to do so. (School Defs. App. at 47, 51, 119-21.) She informed Matt that she wanted Wooleyhan arrested and prosecuted. (<u>See</u> Pl.'s School Defs. App. at 99; Pl.'s Jester App., ECF No. 183, at 34.) She recalls instructing Matt that she "wanted it pursued, whatever that would mean." (Jester App. at 101; Pl.'s Jester App. at 13.) Jester did not participate in the school's disciplinary process any further. Although Jester informed Yore that if anyone deserved an apology it was her, she later stated an apology does nothing for her. (Pl.'s Jester App. at 8, 18-19.)

At Wooleyhan's criminal trial, Jester maintained her assertion that Wooleyhan intentionally elbowed her in the chest. (Sealed App. at 36.)

### 3. Walsh's and White's Versions of Their Involvement

The Monday after the incident, October 27, 2008, both White and Walsh submitted statements. (School Defs. App. at 33-34.) Walsh recalled that Wooleyhan and Pineda were "hugging and kissing" in the hallway on October 24. (<u>Id.</u> at 33.) He recalled that he and Jester instructed them to stop to no avail. (<u>Id.</u>)

Walsh's statement did not indicate that he witnessed the alleged elbowing, but contained three statements he later admitted were not accurate: that the students were late to class, that Jester did not touch Wooleyhan or Pineda, and Jester only intended to get the students to class. (Pl.'s School Defs. App. at 94-96, 144.) He could not recall if the bell had rung, he turned away

before Jester reached Wooleyhan and Pineda, and he did not know Jester's intent. (Id. at 88-91.) He last observed Jester approaching Wooleyhan and Pineda before he returned to his classroom. (Id. at 89-90.) Although Jester listed him as a co-referring teacher, he never disclaimed her account of the incident. (Id. at 92.)

White also prepared a statement on October 27 regarding the incident and a related disruption in her class. In her statement, White indicated that she saw Wooleyhan "push his elbow out toward Mrs. Jester" and later told her class "that the students [sic] moved toward [Jester] with his elbow." (Sealed App. at 117-18.)

White testified at Wooleyhan's criminal trial. (Id. at 59-77.) She testified that she did not witness the incident (id. at 61-62), but the bell had rung and she was standing in a position to witness the incident (id. at 60-61). On cross examination, after reviewing the video, she admitted portions of her statement and direct testimony were false because she was not in position to see certain events and inferred the bell had not rung despite her statements that it had. (See id. at 69-73.)

Walsh was not subpoenaed and did not appear at the criminal trial. (Id. at 55-56.)

### 4. Matt's Version of His Role[5]

Jester reported the alleged elbowing to Matt. Based on Jester's statement and decision to press charges, Matt arrested Wooleyhan and took him to a local State Police facility for processing and fingerprinting. Matt issued Wooleyhan a criminal summons charging him with

---

[5] Matt, a Corporal in the Delaware State Police, was present at the School as a School Resource Officer pursuant to an agreement between the Cape Henlopen School District and the State Police. (Matt App. at 7; see Sealed App. at 269.) He is subject to State Police and School supervision. (Pl.'s Jester App. at 31; see Sealed App. at 269.)

offensive touching in violation of Section 601(a)(1) of Title 11 of the Delaware Code.  See Del. Code Ann. tit. 11, § 601(a)(1) ("A person is guilty of offensive touching when the person . . . [i]ntentionally touches another person either with a member of his or her body or with any instrument, knowing that the person is thereby likely to cause offense or alarm to such other person."); (Pl.'s School Defs. App. at 107).

Matt testified that he relied on Jester's accusation to arrest Wooleyhan, but did not rely on White's or Walsh's statements.  (Matt App. at 8; School Defs. App. at 38-39.)  He also offered conflicting responses regarding whether or not he watched the video of the incident prior to or after the arrest.  (Compare Matt App. at 8 (testifying he did not watch the video before issuing the criminal summons), with Pl.'s Matt App., ECF No. 186, at 18 (responding he "believes he reviewed the tape before the arrest"), Matt Reply App., ECF No. 189, at 11 (responding he "believes he reviewed the tape before or after the arrest").)[6]  In addition, Matt did not think he needed to reasonably believe the touching was intentional to have probable cause for the arrest.  (Pl.'s School Defs. App. at 98.)  Although Pineda and Wriston witnessed the incident, Matt never sought their statements.  (Pl.'s Matt App. at 7; Jester App. at 28.)

Matt acted as the prosecutor at Wooleyhan's criminal trial.  At his deposition, Matt testified that he did not review Walsh's or White's statements or see Jester's initial referral identifying Walsh as a co-referring teacher.  (School Defs. App. at 59; Pl.'s School Defs. App. at 98-100.)  He does not recall speaking with White prior to the trial and does not know Walsh.

---

[6]     Matt has not sufficiently explained the apparent conflict in his deposition testimony and his subsequently amended interrogatory responses.  For this reason, the Court will assume, based on his deposition testimony, that he did not watch the video.  Cf. EBC, Inc. v. Clark Bldg. Sys., 618 F.3d 253, 268-69 (3d Cir. 2010) (noting courts are permitted to ignore affidavits that conflict with prior deposition testimony).

(School Defs. App. at 59; Pl.'s School Defs. App. at 99-100.)

### 5. The School Administrators' Versions of Their Involvement

Maull, the School's Student Services Coordinator, acknowledged that Wooleyhan did not think he had done anything wrong. (Pl.'s School Defs. App. at 54.) Maull did not question Wooleyhan about the incident and assumed Yore or Mrazeck would explain why he was in trouble. (Id. at 56.) He did, however, assert that he read Jester's referral to Wooleyhan and offered him an opportunity to give his side of the story through a written statement. (Id. at 63.) Maull also provided Jester with an incident report to complete regarding the incident, but never received a completed form and never followed up with Jester. (Id. at 51-53.)

Mrazeck, an assistant principal, is the administrator who suspended Wooleyhan pending an investigation. (Id. at 62; see Sealed App. at 291.) She did not speak to any of the parties involved prior to suspending Wooleyhan and did not review any of the statements. (Pl.'s School Defs. App. at 71-72, 74-75.) According to Mrazeck, the suspension was "open-ended" and "[c]ould have been for any number [of days]." (Id. at 67-68.) Mrazeck issued a suspension notice, but did not include the basis for or the length of the suspension, did not provide copies of Jester's discipline referral, and did not advise Wooleyhan of his right to appeal. (Id. at 74, 80-83; Sealed App. at 291.) Mrazeck does not believe the video shows Wooleyhan elbow Jester. (Pl.'s School Defs. App. at 69.)

Yore, the principal at the time of the incident, testified that he spoke with Wooleyhan and Pineda on the date of the incident. (Id. at 18.) Yore did not watch the video prior to Wooleyhan's suspension, instead relying on Jester's referral as the "primary piece of evidence." (Id. at 25, 45-46.) Similarly, the School Review Committee relied on the teachers' and students'

-8-

written statements, the disciplinary referrals, and Wooleyhan's school records.  (See id. at 132-53.)  The attendance records indicated the school had already suspended Wooleyhan for eleven days.  (Id. at 136-38.)  The Committee did not review a video of the incident.  (Id. at 30.)  According to Yore, Matt had access to the teachers and their statements, but Yore has no personal knowledge that Matt communicated with the teachers or reviewed their statements.  (Compare id. at 43-44, with School Defs. Reply, ECF No. 191, Ex. A.)

### 6.    Pineda's and Wriston's Versions of Events

Pineda and another witness, Joseph Wriston ("Wriston"), deny Wooleyhan elbowed Jester.  (Sealed App. at 88, 91, 108.)  Pineda was speaking with Wooleyhan in the hallway when Jester physically separated them.  (Id. at 92-93, 108.)  She denies Wooleyhan touched Jester.  (Id. at 94, 108.)  After her next class, Pineda provided a written statement to an administrator, but no one asked her any questions.[7]  (Id. at 109-10; see also id. at 107.)  She does not mention meeting with Yore.  (See id. at 108-10.)  Pineda also received a text message from a friend in White's class that White told her class:

> "Mrs. Jester had her hands on two peoples [sic] shoulders, and said the teacher asked you two to separate cause [sic] you were already late.  And she said [Wooleyhan] started fussing and elbowed [Jester] in the chest and said got [sic] off and she took him to the office and got him arrested for offensively touching her."

(Id. at 110.)

Wriston was in the hallway on October 24 and witnessed the interaction between Jester Wooleyhan, and Pineda.  (Id. at 88.)  He saw Jester separate Wooleyhan and Pineda, but he did

---

[7]    Although Matt did not obtain Pineda's statement regarding the incident, she approached school administrators and volunteered her account of the interaction with Jester, but did not address the alleged elbowing.  (See Pl.'s School Defs. App. at 108-09.)

not see Wooleyhan touch Jester.  (Id. at 88, 91.)

### 7. Wooleyhan's Parents' Versions of Events

Maull contacted Wooleyhan's mother and informed her that Wooleyhan elbowed Jester, that she was pressing charges, and that Wooleyhan would be arrested, booked, and suspended for "inappropriate sexual behavior" and "defiance of authority."  (Pl.'s School Defs. App. at 105.)

Wooleyhan's parents met with school administrators more than once.  (Id. at 41; School Defs. App. at 23.)  At an October 27 meeting, Mrazeck did not allow the Wooleyhans to view the video but assured them it showed Wooleyhan elbow Jester.  (Pl.'s School Defs. App. at 101-03; see Pl.'s Matt App. at 12.)  In addition, Matt stated Wooleyhan "definitely elbowed . . . Jester in the breast."  (Pl.'s School Defs. App. at 104.)  Matt also informed Wooleyhan's parents that the video depicts Wooleyhan moving his arm and that he "ha[s] to back [the] teachers up here." (Pl.'s Matt App. at 11, 12.)

At a subsequent meeting, Yore requested Wooleyhan apologize to Jester.  (See Pl.'s School Defs. App. at 104.)  According to Wooleyhan's mother, Yore said, "[A]s you know, it's a matter of perception," and she inferred Yore thought Wooleyhan was guilty and wanted an apology from Wooleyhan.  (Id.)  She also contends "there were other actions that let me know that they felt [Wooleyhan] owed an apology."  (Id.)  But Wooleyhan acknowledges he never heard of this request until after his criminal trial, and only from Yore.  (Jester App. at 22-23.)

### 8. The Video of the Incident

A school surveillance camera captured the incident, but it is not continuously running and only captures still shots at a preset interval.  (Sealed Video, ECF No. 97.)  The video shows Wooleyhan and Pineda standing in the hallway to the right of the screen, Jester approaching from

the left side of the screen with her arms out, Jester slide her arms in between Wooleyhan and Pineda, and then Wooleyhan walking down the hall towards the camera with Jester following. (Id. at 7:34:41-47.)  After Wooleyhan and Jester exit the screen, many students remain in the hallway for at least another fifteen to twenty seconds.  (Id. at 7:34:47-35:02.)  At the moment of the alleged elbowing, another student blocks the view of Jester, Wooleyhan, and Pineda.  (See id. at 7:34:42.)  The video shows Wriston on the left side of the screen looking directly at the interaction of Jester, Wooleyhan, and Pineda.

### B.    Procedural History

Wooleyhan filed his initial complaint, along with his parents, on February 24, 2010. (Compl., ECF No. 1.)  The Wooleyhans asserted ten claims against the Cape Henlopen Board of Education (the "Board"), the Cape Henlopen School District (the "School District"), the Delaware State Police, Yore, Mrazeck, Maull, Matt, Jester, White, and Walsh.  They sued the individual defendants in their individual and official capacities.

The Wooleyhans asserted § 1983 claims for  malicious prosecution, unlawful detention, violation of procedural due process, invasion of the right to privacy, and use of excessive force, and a Monell claim against the Board, the School District, and the Delaware State Police.  They also filed state law claims for intentional infliction of emotional distress ("IIED"), defamation, malicious prosecution, false imprisonment, and abuse of process.

On June 28, 2010, the Court granted Jester's Motion for Partial Dismissal.  (Order, ECF No. 68.)  The Court dismissed the parents' IIED claim with prejudice and Wooleyhan's IIED claim without prejudice, and the Court granted Wooleyhan leave to amend.  The Court also dismissed without prejudice his claim for abuse of process, with leave to amend to allege an

ulterior motive.

Wooleyhan filed an Amended Complaint on August 26, 2010, omitting his parents. (Am. Compl., ECF No. 87.) He named the same defendants, but added William Jopp in his capacity as the Chief of the Delaware State Police. Wooleyhan asserts the same claims in his Amended Complaint, against the following Defendants:

| Claim | Matt | Jester | Yore | Mrazeck | Maull | Walsh | White |
|---|---|---|---|---|---|---|---|
| § 1983 Malicious Prosecution | X | X | X | X | X | X | X |
| § 1983 Unlawful Detention | X | X | | X | X | | |
| § 1983 Procedural Due Process | X | X | X | X | X | X | X |
| § 1983 Invasion of Privacy | | | | | | | X |
| § 1983 Excessive Force | X | | | | | | |
| IIED | X | X | X | X | X | X | X |
| Defamation | | X | | | | | X |
| State Malicious Prosecution | X | X | X | X | X | X | X |
| State False Imprisonment | X | X | | X | X | | X |
| Abuse of Process | | X | X | | | | |

At a hearing on October 1, 2010, the Court established discovery guidelines limiting discovery initially to the issue of liability of the individual Defendants regarding the elbowing

incident between Wooleyhan and Jester.  The parties were permitted to engage in discovery

related to the date of the incident, October 24, 2008, to the present on the issue of liability.[8]

Pursuant to the Court's October 1, 2010 order, the Court directed Wooleyhan to file a

contention statement, which he did.  (Contentions, ECF No. 171.)  Defendants have filed motions

for summary judgment in three groups: Matt and Jopp filed together (Matt Mot. Summ. J., ECF

No. 172), Jester filed separately (Jester Mot. Summ. J., ECF No. 177), and the remaining

individual Defendants filed together (School Defs. Mot. Summ. J., ECF No. 180).

## II.  Jurisdiction and Standard of Review

### A.  Jurisdiction

The Court has jurisdiction over Wooleyhan's § 1983 claims pursuant to 28 U.S.C. § 1331

and jurisdiction over his state-law claims pursuant to 28 U.S.C. § 1367(a).  Venue is appropriate

under 28 U.S.C. § 1391(b).

### B.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).[9]  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict

---

[8]        This was done, in part, to give the individual Defendants the opportunity to raise
defenses of qualified immunity early on in the litigation, which they have done, and because
qualified immunity is a defense against suit, not merely a defense against liability.  See Hunter v.
Bryant, 502 U.S. 224, 227 (1991) (per curiam) (stressing importance of resolving qualified
immunity at earliest possible stage of litigation "because 'the entitlement is an immunity from
suit rather than a mere defense to liability'").

[9]        Amendments to Federal Rule of Civil Procedure 56 became effective on
December 1, 2010.  The oft-cited summary judgment standard formerly found in Rule 56(c) is
now located in Rule 56(a), with one alteration: the substitution of the word "dispute" for "issue."
Fed. R. Civ. P. 56(a).  The Rules Advisory Committee explained this alteration better describes

for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion, and identifying those portions of the record that it believes demonstrate the absence of a genuine dispute of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see Fed. R. Civ. P. 56(c)(1).  When the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  Celotex, 477 U.S. at 325.  After the moving party has met its initial burden, the non-moving party's response must "cit[e] to particular parts of materials in the record" to support its assertion that genuine disputes of fact exist.  Fed. R. Civ. P. 56(c)(1)(a).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

On a motion for summary judgment, the Court must view the evidence presented in the light most favorable to the non-moving party.  Anderson, 477 U.S. at 255.  The non-movant's evidence is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor.  Id.  Further, credibility determinations, weighing of evidence, and drawing of legitimate

the summary judgment inquiry, but it does not affect the substantive standard or the applicability of prior decisions construing the standard.  Fed. R. Civ. P. 56 advisory committee's note.

Pursuant to 28 U.S.C. § 2074(a) and the April 28, 2010 Supreme Court order approving the amendments, the amended version of Rule 56 governs all proceedings commenced on or after December 1, 2010, and all proceedings then pending, "insofar as just and practicable."  Defendants filed their Motions after December 1, 2010.  Accordingly, when necessary, the Court quotes the Rule's new language.

inferences from the facts are jury functions, not those of a judge.  Id.

**III.    Discussion**

At oral argument on Defendants' Motions, the Court sought clarification as to which claims Wooleyhan is still pursuing.  Counsel confirmed that Wooleyhan is abandoning the following claims:

- against Matt – § 1983 procedural due process, excessive force, and IIED;

- against Yore – federal and state malicious prosecution;

- against Mrazeck – federal and state malicious prosecution and § 1983 unlawful detention;

- against Maull – federal and state malicious prosecution, § 1983 unlawful detention, and state false imprisonment; and

- against White – state false imprisonment.

Based on Wooleyhan's allegations and contentions, the Court believes that settled legal principles warrant dividing the individual Defendants into three groups.  Matt, as a state trooper, is in his own group; the school administrators – Yore, Mrazeck, and Maull – make up a second group; and the teachers – Jester, White, and Walsh – make up the third.  The Court's analysis is organized accordingly.

Further, the Court concludes the following genuine disputes of material fact exist between the parties: (1) whether Wooleyhan intentionally elbowed Jester; (2) whether Jester knowingly lied about the elbowing; (3) whether White lied about witnessing Wooleyhan "push his elbow out toward" Jester; and (4) whether anyone advised Wooleyhan of Jester's accusations against him prior to his suspension.  In light of these disputes and construing the facts in

Wooleyhan's favor, and considering applicable precedent in this Circuit, the Court concludes summary judgment is inappropriate for the § 1983 unlawful detention and state malicious prosecution claims against Jester and the defamation claims against Jester and White.

### A.     Claims Against Matt

Based on the Amended Complaint and Wooleyhan's concessions, the following claims remain against Matt: federal and state malicious prosecution, § 1983 unlawful detention, and state false imprisonment.  The Court concludes that Matt is entitled to summary judgment on each of these claims because he had probable cause to arrest and prosecute Wooleyhan.[10]

Generally, to state a § 1983 claim, a plaintiff must establish (1) that the defendant, acting under color of state law,[11] (2) deprived plaintiff of a right secured by the Constitution or the laws

_____

[10]     Matt also argues, and Wooleyhan concedes, that he is entitled to sovereign immunity for claims against him in his official capacity.  A suit against a state official is a suit against the state itself, see Hafer v. Melo, 502 U.S. 21, 26 (1991) (citing Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989)), and the Court limited Defendants to seeking summary judgment in their individual capacities at this stage of the litigation.  Therefore, the Court will not consider this argument at this time.

Matt also argues Jopp should be dismissed because he is not the correct party and was not properly served.  Because the Court limited the scope of summary judgment to liability of individual Defendants, and Jopp is sued only in his official capacity, the Court will not consider Jopp's arguments at this time.  But Wooleyhan should consider whether he has sued the correct parties and properly served all Defendants.

[11]     There is no dispute that Matt, Yore, Mrazeck, and Maull were acting under the color of state law throughout the events of this case.  White and Walsh are entitled to summary judgment on all pending § 1983 claims for the reasons discussed infra.  Jester did not raise the under color of state law issue in her initial brief and only responded to the issue at the Court's request.  Notwithstanding, the Court concludes sufficient genuine disputes of material fact exist – e.g., whether she was acting as a teacher when she submitted her referrals – to preclude ruling on this issue at the summary judgment stage.  Instead, the jury should resolve these factual disputes considering the totality of the circumstances.  See Sollman v. Renninger, No. 07-1183, 2008 WL 5156617, at *3 (E.D. Pa. Dec. 5, 2008) (asserting whether defendant acted under color of state law is factual question involving evaluation of context); cf. Harvey v. Plains Twp. Police Dep't, __ F.3d __, No. 09-1170, 2011 WL 1108220, at *1 (3d Cir. Mar. 28, 2011) (holding, in private

of the United States.  Chainey v. Street, 523 F.3d 200, 219 (3d Cir. 2008).  There are three categories of due process claims under the Fourteenth Amendment which can be brought in a § 1983 action:

> "First, the [Due Process] Clause incorporates many of the specific protections defined in the Bill of Rights.  A plaintiff may bring suit under § 1983 for state officials' violation of his rights . . . .  Second, the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.' . . . The Due Process Clause also encompasses a third type of protection, a guarantee of fair procedure.  A § 1983 action may be brought for a violation of procedural due process."

Zinermon v. Burch, 494 U.S. 113, 125 (1990) (citation omitted).

### 1.  Malicious Prosecution under § 1983

To establish a claim for malicious prosecution under § 1983, a plaintiff must establish that (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in plaintiff's favor; (3) the proceeding was initiated without probable cause, (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.  McKenna v. City of Philadelphia, 582 F.3d 447, 461 (3d Cir. 2009).

Matt contests the probable cause, malice, and deprivation elements, and also asserts he is entitled to prosecutorial immunity and qualified immunity.  In response, Wooleyhan argues Matt lacked probable cause for the arrest for failing to further investigate Jester's accusation, acted with malice when he abdicated his responsibility to investigate, and deprived Wooleyhan of his liberty interest in a public education.  He also contends Matt has not satisfied the high burden for

repossession case, that "[a]ction under color of state law must be addressed after considering the totality of the circumstances and cannot be limited to a single factual question").

absolute immunity and is not entitled to qualified immunity because he had a duty to investigate readily available exculpatory evidence.

Probable cause to arrest exists where the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed. Estate of Smith v. Marasco, 318 F.3d 497, 514 (3d Cir. 2003). Generally, the question of probable cause in a § 1983 damages suit is one for the jury, particularly where the determination rests on credibility conflicts. Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 788 (3d Cir. 2000). A district court may conclude that probable cause exists as a matter of law if the evidence, viewed most favorably to the plaintiff, would not support a contrary factual finding. Id. at 788-89. The function of the court is to determine whether objective facts available to the police at the time of the arrest were sufficient to justify a reasonable belief that the plaintiff had committed the crime for which he was arrested. Id. at 789.

Probable cause looks to the totality of the circumstances, but the standard does not require officers to correctly resolve conflicting evidence or that their credibility determinations were, in retrospect, accurate. Wright v. City of Philadelphia, 409 F.3d 595, 603 (3d Cir. 2005). Even if the officer makes a mistake, the court must ask if his belief was unreasonable in light of the information possessed at the time of the arrest. Id. Ultimately, probable cause requires more than mere suspicion, but it does not require evidence of guilt beyond a reasonable doubt. Orsatti v. N.J. State Police, 71 F.3d 480, 482-83 (3d Cir. 1995).

When police receive a reliable identification by a victim of his or her attacker, the police have probable cause to arrest. See Sharrar v. Felsing, 128 F.3d 810, 818 (3d Cir. 1997) (finding probable cause even though victim accused husband only after identifying different attacker).

Police can assess the victim's demeanor, find the story credible, and rely on the identification to make an arrest.  See Mitchell v. Obenski, 134 F. App'x 548, 551 (3d Cir. 2005) (asserting that reliable victim identification established probable cause, and opportunity for more thorough investigation does not vitiate the initial probable cause).

This precept, however, is not absolute.  Wilson v. Russo, 212 F.3d 781, 790 (3d Cir. 2000).  The police may have a duty to investigate when there is plainly exculpatory evidence, such as a blatantly erroneous physical description, reliable DNA conclusively exculpating the alleged perpetrator, or conflicting identifications by multiple eyewitnesses.  See id.  Moreover, a victim's identification can be outweighed by independent exculpatory evidence or substantial evidence of a witness's unreliability that is known to the arresting officer.  Id.  But once the police have sufficient facts to establish probable cause, there is no constitutional duty to further investigate in hopes of finding exculpatory evidence.  Patterson v. Sch. Dist. of Phila., No. 99-4972, 2000 WL 1020332, at *6 (E.D. Pa. July 19, 2000) (citing Baker v. McCollan, 443 U.S. 137, 145 (1979)); see also Porter v. Gray, No. 05-231, 2007 WL 464694, at *13-14 (W.D. Pa. Feb. 13, 2007) (finding no constitutional violation where police could have, but did not, perform more thorough investigation by attempting to obtain statements from others with knowledge of events).

In cases where there is some exculpatory evidence or unreliability, courts have considered the context of the identification, and have not stated police can rely on any accusation.  Wilson, 212 F.3d at 790-92.  Instead, courts should engage in routine probable cause analysis, weighing the evidence available to the police.  See id.  If not outweighed, the court can still determine probable cause as a matter of law.  See id. at 791-92; see also id. at 792-93 (noting defendant's

friend's partial alibi statement did not overwhelm victim's identification). In Wilson, the Third

Circuit affirmed summary judgment even though the police officer showed reckless disregard for

the truth when he omitted and misstated relevant facts in procuring an arrest warrant. Id. at 789.

The court concluded that, despite his reckless disregard for facts such as a second victim's failure

to identify the defendant and discrepancies in the victims' physical descriptions and the

defendant's physical attributes, these facts were not material. Id. at 791-92. Even if the officer

had disclosed or properly stated the facts, no reasonable jury could disagree that probable cause

still existed to issue the arrest warrant largely based on one victim's identification. Id. at 792.

Further, in Merkle, the Third Circuit concluded that a police detective had probable cause

to arrest a teacher for stealing school supplies after the school principal reported the incident and

the teacher's statements to the police. 211 F.3d at 789. Based on that information, the court

concluded that the detective possessed knowledge of a credible report from a credible

eyewitness, which the detective had every reason to believe. Id. at 790 n.8. The report itself

established probable cause, and the detective was not required to further investigate the probable

cause that, in the detective's mind, already existed. Id.

In this case, Matt had a report from a victim identifying her attacker, which establishes

probable cause. See Sharrar, 128 F.3d at 818. Matt had no duty to further investigate and

Wooleyhan presents no facts of which Matt had knowledge to undermine Jester's reliability. The

Court concludes that a reasonably prudent person in these circumstances would have believed

probable cause existed to arrest Wooleyhan. Wooleyhan attempts to counter the accusation with

his own testimony, his girlfriend's testimony, and the testimony of a third eyewitness, as well as

a video of the incident. None of this evidence outweighs Jester's prompt accusation to preclude

a finding of probable cause. The proffered testimony is not plainly exculpatory and even if Matt had collected the statements, they would not have vitiated probable cause based on Jester's statement to Matt. See Wright, 409 F.3d at 603 (stating probable cause standard does not require officers to correctly resolve conflicting evidence or that their credibility determinations were, in retrospect, accurate). The video is inconclusive at best because another student blocks the view at the time of the alleged elbowing. (See Sealed Video.) Therefore, the video is not plainly exculpatory. See, e.g., Wilson, 212 F.3d at 790 (identifying examples of plainly exculpatory evidence requiring further investigation).

Finally, Wooleyhan contends that Matt could not believe he had probable cause because, contrary to the offensive touching statute, he did not think he had to believe the touching was intentional. (See Pl.'s School Defs. App. at 98.) The Court, however, considers whether a reasonable person, knowing what Matt knew, would believe probable cause existed. Regardless of Matt's subjective understanding of the elements of an offensive touching, based on Jester's accusation, a reasonable person in Matt's position could reasonably believe all elements of the crime existed. (See Matt App. at 37 ("[Wooleyhan] turned and hit the victim in the chest with his right hand causing alarm to the victim.")); cf. Merkle, 211 F.3d at 790 (concluding probable cause existed for all elements because reasonable for detective to think allegation of "stealing" meant "with intent to deprive" as required by the criminal statute). Because Matt had probable cause to arrest Wooleyhan, the claim for malicious prosecution fails.

### 2.    State Malicious Prosecution

To establish a claim for malicious prosecution under Delaware law, (1) there must have been a prior institution or continuation of some regular judicial proceeding against the plaintiff;

(2) the former proceedings were by, or at the instance of, the defendant; (3) the proceedings terminated in plaintiff's favor; (4) there was malice for instituting the former proceedings; (5) there is want of probable cause for institution of the former proceedings; and (6) injury or damages resulted to the plaintiff. Stidham v. Diamond State Brewery, Inc., 21 A.2d 283, 284 (Del. 1941). Delaware's standards for probable cause are similar to those under federal law. See Quartarone v. Kohl's Dep't Stores, Inc., 983 A.2d 949, 957-58 (Del. Super. Ct. 2009).

As with the federal claim, Matt asserts he had probable cause and disputes malice; Wooleyhan argues Matt lacked probable cause for the arrest for failing to further investigate Jester's accusation and acted with malice when he abdicated his responsibility to investigate.

Matt is entitled to summary judgment on the state malicious prosecution claim for the same reason he is entitled to summary judgment on the federal version – he had probable cause to arrest and prosecute Wooleyhan based on Jester's reliable identification of her attacker. There is no genuine dispute of material fact that Jester reported the attack to Matt or that Matt had any reason to consider her accusation unreliable. Wooleyhan's testimony, the testimony of two other witnesses, and the inconclusive video do not undermine the Court's conclusion that Matt acted reasonably in initiating the prosecution.

### 3.    § 1983 Unlawful Detention and State False Imprisonment

An unlawful detention claim under § 1983 requires the plaintiff to establish (1) a Fourth Amendment seizure (2) without probable cause. See Banks v. Gallagher, 686 F. Supp. 2d 499, 507-08 (M.D. Pa. 2009) (citing Dowling v. City of Philadelphia, 855 F.2d 136, 141 (3d Cir. 1988)).

False imprisonment in Delaware occurs when one person unlawfully restrains the

physical liberty of another, and is distinguishable from the tort of false arrest which is an unlawful arrest. Shaffer v. Davis, No. 89-20, 1990 WL 81892, at *2 (Del. Super. Ct. June 12, 1990). An action for false imprisonment will not lie where the arrest was lawful, i.e. based on probable cause. See Boulden v. Turner, No. 04-10-31, 2007 WL 3378662, at *4 (Del. Super. Ct. Apr. 12, 2007).

For the reasons stated in the foregoing sections, Matt had probable cause to arrest and prosecute Wooleyhan under both federal and Delaware law. Accordingly, Matt cannot be liable for unlawful detention under § 1983 or false imprisonment under Delaware law.

### B.    Claims Against School Administrators – Yore, Mrazeck, and Maull

Based on the Amended Complaint and Wooleyhan's concessions, the following claims remain against this group of Defendants: Yore – § 1983 procedural due process, IIED, and abuse of process; Mrazeck – § 1983 procedural due process and IIED; and Maull – § 1983procedural due process and IIED. There exists a genuine dispute of material fact regarding the due process claim. The Court will consider these Defendants' claim for qualified immunity infra. Otherwise, these Defendants are entitled to summary judgment on the IIED claim and Yore is entitled to summary judgment on the abuse of process claim.

### 1.    § 1983 Procedural Due Process

To establish a procedural due process claim under § 1983, the plaintiff must prove (1) a deprivation of an individual interest encompassed by the Fourteenth Amendment's protection of life, liberty, or property, and (2) that the procedures available did not provide due process of law. Hill v. Borough of Kutztown, 455 F.3d 225, 233-34 (3d Cir. 2006). The first step is to identify the exact contours of the underlying right the plaintiff claims was violated and to determine

whether he alleged a constitutional deprivation at all.  See Chainey, 523 F.3d at 219.

Procedural due process does not protect every benefit; rather, to have a property interest in a benefit, a person must clearly have more than an abstract need or desire and more than a unilateral expectation of receiving the benefit.  Town of Castle Rock v. Gonzales, 545 U.S. 748, 756 (2005).  These "entitlements" are not established by the Constitution, but are created and defined by existing rules or understandings that stem from an independent source, such as state law.  Id.

Against Yore, Mrazeck, and Maull, Wooleyhan claims a liberty interest in education, citing Shuman v. Penn Manor School District, which did not recognize a liberty interest in education; it recognized a property interest in education based on a Pennsylvania regulation.  See 422 F.3d 141, 149 & n.3 (3d Cir. 2005) (citing 22 Pa. Code § 12.8(a) (2005)); accord Goss v. Lopez, 465 U.S. 565, 573-74 (1975) (holding Ohio law established a legitimate entitlement to a public education which created a property interest protected by due process).  Although Delaware does not have legislation as specific as the Pennsylvania regulation cited in Shuman, at least one court suggests a right to public education exists in the State's constitution.  See Jones v. Milford Sch. Dist., No. 3194, 2010 WL 1838961, at *3 n.23 (Del. Ch. Apr. 29, 2010) (citing Del. Const. art. X, § 1).  Another court asserts there is no question Delaware citizens are entitled to a free public education under state law.  Rucker v. Colonial Sch. Dist., 517 A.2d 703, 704 (Del. Super. Ct. 1986); see also Del. Code Ann. tit. 14, §§ 201-02 (establishing "general and efficient" public schools for Delaware residents aged 5-20); cf. M.G. v. Crisfield, 547 F. Supp. 2d 399, 408 (D.N.J. 2008) (recognizing entitlement based on similar New Jersey statute).  Thus, the Court

concludes that Wooleyhan has an entitlement under Delaware law to a public education.[12]

Once the court determines that procedural due process applies, the question remains what process is due. See Shuman, 422 F.3d at 149. In Goss v. Lopez, the Supreme Court identified the process due to a public school student suspended for ten days or less: (1) the student must be given oral or written notice of the charges and, if he denies them, (2) an explanation of the evidence the authorities have and (3) an opportunity to present his side of the story.[13] 419 U.S. at 581. Goss requires only that the student be given some kind of notice and some kind of hearing. Id. at 579. There need be no delay between the time notice is given and the time of the hearing – the disciplinarian may informally discuss the alleged conduct with the student minutes after it has occurred. Id. at 582. Although due process in this context does not require the opportunity for counsel or confronting or calling witnesses, the student must first be told of what he is accused and the basis for the accusation.[14] Id. at 582.

_____

[12] Defendants contend a Delaware statute extinguishes this right because it mandates suspension following a student's arrest. (School Defs. Letter Br., ECF No. 195); see Del. Code Ann. tit. 14, § 4112(d). The Court declines to determine the effect section 4112 may have on the right to public education under Delaware law in light of the Court's qualified immunity determination infra.

[13] The adequacy of process is a question of federal law, not state law. See McDaniels v. Flick, 59 F.3d 446, 458 (3d Cir. 1995) (citing Vitek v. Jones, 445 U.S. 480, 491 (1980)). Further, the Court must determine whether Defendants complied with the minimum procedures established in Goss, not whether other alternatives are available.

[14] In establishing these minimum procedural guidelines, the Court balanced the school's need to maintain order free from the burden of "elaborate hearing requirements" against the general interest of arriving at the truth inherent in the concept of due process and "giv[ing] a [student] in jeopardy of serious loss notice of the case against him and opportunity to meet it." Goss, 419 U.S. at 580. But there remains the overarching principle that "public education in our Nation is committed to the control of state and local authorities." Id. at 578 (quoting Epperson v. Alabama, 393 U.S. 97, 104 (1968); see also Seyfried v. Walton, 668 F.2d 214, 218 (3d Cir. 1981) ("The Supreme Court has repeatedly given voice to th[e] need for judicial deference to the

Yore, Mrazeck, and Maull argue that they complied with the requirements of Goss because Wooleyhan either had constructive notice of the charges against him or he received actual notice after he returned from the police station. They also claim he had two opportunities to provide his side of the story – first, writing a statement that any contact was accidental, then declining to comment. Wooleyhan contends that (1) something more than Goss was required because (a) the initial suspension was open-ended and (b) he was facing criminal charges, and (2) Yore, Mrazeck, and Maull failed to comply with Goss.

Although no courts in the Third Circuit have addressed Wooleyhan's first argument, other courts agree that the procedures used should be gauged according to the student's ultimate suspension. See, e.g., Donovan v. Ritchie, 68 F.3d 14, 17 (1st Cir. 1995) (concluding Goss applies where student initially suspended indefinitely, but received letter within five days imposing a ten-day suspension); McClain v. Lafayette Cnty. Bd. of Educ., 673 F.2d 106, 107-08 & n.1 (5th Cir. 1982) (applying Goss where originally indefinite suspension lasted six days); Student Doe v. Mercer Island Sch. Dist. No. 400, No. 06-395, 2007 WL 215858, at *5-6 (W.D. Wash. Jan. 26, 2007) (finding nothing more than Goss required where student ultimately suspended ten days, but expressing concern regarding school's practice of imposing indefinite expulsions), aff'd 288 F. App'x 426 (9th Cir. 2008). Because Yore imposed a three-day suspension and Wooleyhan returned after those three days, the Court concludes Goss controls.

Further, pending criminal charges stemming from the underlying conduct do not alter the process required under Goss. Wooleyhan's position is undermined by Goss itself: one of the

comprehensive authority of States and of school officials, consistent with constitutional safeguards, concerning educational matters.") (quotations omitted).

students in Goss allegedly physically attacked a police officer.  Goss, 419 U.S. at 570.  Despite

the potential for charges related to this conduct, Goss established the minimum procedures

required for student suspensions ten days or less.  Further, Shuman could have led to criminal

charges for sexual misconduct, but the Third Circuit required nothing more than Goss

procedures.  See Shuman, 422 F.3d at 144.  Wooleyhan cites two cases in support of his position,

but both cases arose from formal disciplinary proceedings at the college level.  See Gorman v.

Univ. of R.I., 837 F.2d 7, 16 (1st Cir. 1987); Gabrilowitz v. Newman, 582 F.2d 100, 106-07 (1st

Cir. 1978).  Moreover, contrary to these cases, Goss expressly eschews a formal hearing and the

need for counsel for school suspensions ten days or less.  Goss, 419 U.S. at 582, 583.  Finally,

the parties' post-argument letters do not change the Court's conclusion that Goss controls.

Even under Goss's minimal requirements, there are disputed issues of fact as to whether

Wooleyhan received the requisite notice and opportunity before he was suspended.  Defendants

contend he received notice on at least two occasions – first, he received constructive notice[15]

while sitting in the office prior to his arrest, and second, when he returned from the police station

and Maull "gave [him] the whole spiel."  (School Defs. App. at 14, 22.)  Defendants contend he

then had the opportunity to respond in both instances – after the constructive notice, he offered

---

[15]     Defendants contend several cases support their constructive notice theory, but the
notice in those cases is materially distinguishable from this case.  In Smith v. Severn,
administrators showed the student facing discipline a video of his conduct and offered him an
opportunity to ask questions and explain himself.  129 F.3d 419, 428 (7th Cir. 1997).  In S.G. ex
rel. A.G. v. Sayreville Board of Education, the principal asked the student to explain his conduct,
and the student did.  333 F.3d 417, 419 (3d Cir. 2003).  In the case with the closest factual
similarity, Baxter v. Round Lake Area Schools, the student met with an administrator
immediately after a fight with another student and never questioned why he was meeting with the
administrator.  856 F. Supp. 438, 443 (N.D. Ill. 1994).  In this case, Wooleyhan disputes
elbowing Jester and claims to have inquired many times why he was in the office.  These facts
distinguish this case from those Defendants cite.

his written statement that any contact was accidental, and after the "whole spiel," he declined to respond. Wooleyhan, however, contends that he only heard portions of the conversation in the office and claims he did not know why he was there. Also, Maull testified he did not meet with Wooleyhan after Wooleyhan returned from the police station, contradicting Wooleyhan's own admission that Maull gave him the "whole spiel." Accordingly, summary judgment is inappropriate as to the substantive claim itself. The Court considers qualified immunity infra.

### 2.    Intentional Infliction of Emotional Distress ("IIED")

Delaware has adopted section 46 of the Restatement (Second) of Torts for IIED claims: "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results, for such bodily harm." See Nieves v. Ace Mkts., Inc., 541 F. Supp. 2d 600, 611 (D. Del. 2008); Jordan v. Delaware, 433 F. Supp. 2d 433, 444 (D. Del. 2006). Thus, a claimant must establish (1) extreme and outrageous conduct, (2) an intent to cause severe emotional distress or reckless disregard with respect to causing emotional distress, and (3) the conduct actually caused severe emotional distress. Jordan, 433 F. Supp. 2d at 444.

Courts have defined extreme and outrageous conduct as behavior so extreme in degree as to go beyond all possible bounds of human decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Id. (citing Mattern v. Hudson, 532 A.2d 85, 86 (Del. Super. Ct. 1987)). The court is responsible for determining whether the alleged conduct is sufficiently extreme and outrageous in the first instance. Mattern, 532 A.2d at 86. But where reasonable people may differ, the trier of fact must determine whether there has been sufficiently extreme and outrageous conduct as to result in liability. Id.; Thomas v. Harford Mut. Ins. Co., No. 01-01-

046, 2004 WL 21742143, at *2 (Del. Super. Ct. Apr. 7, 2004).

Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. Miller v. Spicer, 822 F. Supp. 158, 168 (D. Del. 1993) (citing Rest. (2d) of Torts § 46, cmt. d). IIED does not exist to provide a cause of action against poor judgment, it exists to hold accountable someone who does something atrocious and intolerable. Farmer v. Wilson, No. 91-09-023, 1992 WL 331450, at *5 (Del. Super. Ct. Sept. 29, 1992). And failure to take action in light of another's allegedly extreme and outrageous conduct is not extreme and outrageous itself. See Collins v. African Methodist Episcopal Zion Church, No. 04-02-121, 2006 WL 1579828, at *10 (Del. Super. Ct. Mar. 29, 2006). Further, as the Court previously pointed out in its June 28, 2010 Memorandum on Partial Dismissal, the same alleged acts which give rise to a defamation claim cannot serve as the basis for an IIED claim under Delaware law. See Barker v. Huang, 610 A.2d 1341, 1351 (Del. 1992); (see also Memo. on Partial Dismissal, ECF No. 67, at 7-8). Where the gravamen or a significant portion of the complaint sounds in defamation, no independent action for IIED will lie; a party cannot simultaneously allege defamation and IIED. Barker, 610 A.2d at 1351; see also Bickling v. Kent Gen. Hosp., 872 F. Supp. 1299, 1311-12 & n.2 (D. Del. 1995) (supporting proposition that court can treat separately allegations sounding in defamation from other IIED allegations).

Wooleyhan contends Yore, Mrazeck, and Maull committed the following extreme and outrageous conduct: failing to conduct a proper investigation before and after the suspension and providing false information. Barker precludes IIED liability for disseminating false information. Although there is no Delaware case law regarding proper investigations, other courts have found such conduct insufficient for IIED liability. See Tracy v. New Milford Public Schs., 922 A.2d

280, 285-87 (Conn. App. Ct. 2005) (finding harassment, intimidation, and conspiracy to initiate disciplinary proceedings without proper investigation insufficient for IIED claim); Davila v. Pay & Save Corp., No. 08-02-452, 2003 WL 22413632, at *3-4 (Tex. App. Oct. 23, 2003) (concluding not extreme and outrageous to conduct an improper investigation or to fail to pursue exculpatory evidence following serious accusations in employment context); Rushing v. Bosse, 652 So. 2d 869, 876 (Fla. Dist. Ct. App. 1995) (finding attorney's facilitation of adoption without notice to biological father and grandparents, as required by state law, and failure to conduct proper investigation into relatives, not utterly outrageous). Wooleyhan does not offer any case law to the contrary. Thus, even assuming Yore, Mrazeck, and Maull failed to conduct a proper investigation, this conduct does not rise to the level of extreme and outrageous. Accordingly, they are entitled to summary judgment on this claim.

### 3. Abuse of Process

The elements for a claim of abuse of process in Delaware are (1) an ulterior purpose, and (2) a willful act in the use of the process not proper in the regular conduct of proceedings. Nix v. Sawyer, 466 A.2d 407, 412 (Del. Super. Ct. 1983). Liability requires some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process. The plaintiff must show some form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as obtaining the surrender of property or payment of money, by use of the process as a threat or club. See Rhinehardt v. Bright, No. 03-03-05, 2006 WL 2220972, at *4 (Del. Super. Ct. July 20, 2006) (denying summary judgment to defendants in light of superficial appearance of genuine dispute regarding whether they brought criminal charges to gain tactical advantage in longstanding boundary dispute with plaintiff). The mere

filing of suit, even with bad intentions or an ulterior motive, is not sufficient to prove abuse of process; there must be use of threat or coercion not proper in regular conduct of suit after its commencement. Nix, 466 A.2d at 412.

Yore argues he is entitled to summary judgment for this claim because Wooleyhan waived it by failing to assert supporting contentions. Alternatively, he contends there is no factual support because he suggested an apology to Wooleyhan only after the criminal trial, Yore had no authority over Matt, and Yore was proposing an amicable resolution, not blackmail. Wooleyhan responds that Yore suggested to his parents that he apologize in exchange for dropping the criminal charges and Yore had supervisory authority over Matt to effectuate the purported exchange.

Contrary to Yore's position, Wooleyhan did not waive this claim; he contends that Yore "attempted to broker a deal by requesting [Wooleyhan] apologize to Jester in an apparent attempt to get her to drop the criminal charges." (See Contentions ¶ 194.) But Wooleyhan has not introduced any evidence from the record to support a finding that Yore sought to trade dropping the charges for an apology. According to Wooleyhan's mother, "Mr. Yore asked for [Wooleyhan]'s apology. And he said, you know, it's a matter of perception. So my inference to that would be he felt [Wooleyhan] was guilty. He wanted an apology out of [Wooleyhan]." (Pl.'s School Defs. App. at 104 (emphasis added).) This testimony suggests nothing about an exchange and it is based on Wooleyhan's mother's inference, i.e. speculation, which is not sufficient on summary judgment. See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999) (noting that speculative and conclusory allegations do not satisfy non-moving party's burden on summary judgment). She also testified that "other actions let me know

they felt [Wooleyhan] owed an apology," but she does not identify these "other actions" or "they." (Pl.'s School Defs. App. at 104.)

Further, during a conversation between Yore and Jester, Jester said that if anyone deserved an apology it was her, but Yore testified there was never any discussion of an exchange. (Pl.'s Jester App. at 18-19.) In her deposition, Jester denies requesting an apology, denies any exchange, and denies Yore tried to broker an apology. (Id. at 8.)

Even construing Jester's statement to Yore as an apology request, there is no evidence that Yore had an ulterior motive or sought a collateral advantage, and no evidence of a threat or objective not part of the process. Even in the best light for Wooleyhan, and assuming Yore had authority to have Matt drop the charges, the evidence only shows Yore suggested Wooleyhan apologize. Nothing suggests Yore offered an exchange or even hinted at dropping the charges. Moreover, no case law suggests a request for an apology is an abuse of process. Cf. Bayer AG v. Sony Elecs., 229 F. Supp. 2d 332, 368-69 (D. Del. 2002) (finding attempt to procure settlement is not an abuse of process).

For these reasons, Yore is entitled to summary judgment on this claim.

### C.    Claims Against Teachers Jester, White, and Walsh

Based on the Amended Complaint and Wooleyhan's concessions, the following claims remain against Jester: federal and state malicious prosecution, § 1983 unlawful detention, § 1983 procedural due process, IIED, defamation, state false imprisonment, and abuse of process. Against White and Walsh, Wooleyhan is still pursuing federal and state malicious prosecution, § 1983 procedural due process, and IIED. Wooleyhan asserts two additional claims against White: § 1983 invasion of privacy and defamation.

As explained above, summary judgment is inappropriate for Wooleyhan's § 1983 unlawful detention, state malicious prosecution, and defamation claims against Jester,[16] and his defamation claim against White.[17]

### 1.    Malicious Prosecution under § 1983

The Court previously enumerated the elements of this claim. Jester contends this claim fails because she did not initiate the prosecution, probable cause existed, she did not act with malice, and Wooleyhan has not alleged deprivation of a sufficient liberty interest. White and Walsh contend they did not initiate the prosecution and did not act with malice. Alternatively, all three argue they are entitled to qualified immunity. Wooleyhan opposes summary judgment because private individuals can initiate prosecutions, Defendants' knowingly false statements preclude probable cause and establish malice, and deprivation of his interest in a public education constitutes a sufficient deprivation for a malicious prosecution claim.

---

[16]    Jester argues that she is entitled to state-law immunity for the state-law claims because a state statute required her to report Wooleyhan's offensive touching. See Del. Code Ann. tit. 14, § 4112. Subsection (f) immunizes any school employee who reports in good faith. Good faith is not defined in section 4112, and absent a statutory definition, good faith means honesty of purpose and integrity of conduct without knowledge, actual or sufficient to demand inquiry, the conduct is wrong. Cf. Parsons v. Mumford, No. 95-09-031, 1997 WL 819122, at *6 n.29 (Del. Super. Ct. Nov. 25, 1997) (defining good faith in context of State Tort Claims Act, Del. Code Ann. tit. 10, §§ 4001, 4003). The good faith analysis requires inquiry into the subjective intent of officials, Wiers v. Barnes, 925 F. Supp. 1079, 1092 (D. Del. 1996), and is a question of fact, Woulard v. Food Serv., 294 F. Supp. 2d 1122, 1133 (D. Del. 2003).

If Jester knowingly made a false accusation to Matt, and then requested Matt to arrest and prosecute Wooleyhan, the Court cannot conclude her conduct was done with honesty of purpose as a matter of law. Therefore, it is a question best left for a jury.

[17]    White contends she is entitled to state law immunity under the State Tort Claims Act. See Del. Code Ann. tit. 10, §§ 4001, 4003. White is not entitled to immunity at this stage for the same reason Jester is not – the veracity of her accusation is in dispute. Therefore, the jury must determine whether she acted in good faith or with the requisite degree of fault.

-33-

The Third Circuit recognizes that a claim for malicious prosecution can survive against the person pressing criminal charges against the plaintiff, even if a court concludes law enforcement agents had probable cause to arrest and prosecute the plaintiff. See Merkle, 211 F.3d at 794 ("As instigators of the arrest, . . . it is possible that the [School] District and [the superintendent] were in possession of additional information, not provided to [the police], that would negate any probable cause . . . ."). But even assuming Wooleyhan can establish all other elements of this claim, the Court concludes that he cannot establish the deprivation element. A sufficient deprivation for malicious prosecution must be based on an explicit right in the Constitution, and cannot be based on substantive due process. See id. at 792 (citing Albright v. Oliver, 510 U.S. 266, 272 (1994)). It can, however, be based on a violation of procedural due process. Torres v. McLaughlin, 163 F.3d 169, 173 (3d Cir. 1998). The requirement of a deprivation of an explicit constitutional right distinguishes a § 1983 claim for malicious prosecution from its state-law analogue. See Merkle, 211 F.3d at 792.

In this case, Wooleyhan contends he was deprived of his procedural due process interests in education and reputation. A claim for violation of liberty interest in reputation requires the plaintiff to identify the alteration or extinguishment of some interest created by state law. See Sturm v. Clark, 835 F.2d 1009, 1012-13 (3d Cir. 1987). Wooleyhan asserts his interest in a public education. Accordingly, the Court must answer the same question with respect to both asserted deprivations – did Defendants violate Wooleyhan's interest in a public education?

As indicated above, Delaware recognizes the right to a public education, but Defendants Jester, White, and Walsh did not participate in the school disciplinary process. Although Jester submitted her referral to initiate the process, and White and Walsh submitted statements the

following Monday, none of them participated in the process any further.  See Rode v.

Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) (requiring § 1983 claimant to show each

defendant's personal involvement in alleged violation).  Even if they initiated or participated by

submitting statements or reports, it was not up to them to provide the notice and opportunity

Goss requires.  Rather, the school administrators controlled that process.  For that reason,

Wooleyhan has failed to provide evidence showing a genuine dispute of fact, requiring a trial,

concerning his claim of a deprivation of a specific constitutional right by Jester, White, or Walsh

that would be sufficient to support his malicious prosecution claim under § 1983.  Accordingly,

they are entitled to summary judgment on this claim.**[18]**

## 2.     State Malicious Prosecution

The Court previously identified the elements for this claim.  Delaware courts recognize

that a plaintiff can maintain a malicious prosecution claim against a purported victim who reports

an alleged crime to the police.  See Goode v. Kimbro, No. 07-07-028, 2009 WL 693256, at *3

(Del. Super. Ct. Mar. 4, 2009) (noting dispute of fact regarding victim's involvement because

detective testified he brought charges at victim's request).  Whether a non-victim can be liable

presents a more difficult question.

Restatement (Second) of Torts § 655 suggests that a private person who takes an active

part in continuing or procuring the continuation of criminal proceedings initiated by another can

be liable as if he had initiated himself.  Liability under section 655 requires the defendant to take

---

[18]      Because Wooleyhan cannot show a violation of a constitutional right in support of
this claim, Jester, White, and Walsh are entitled to qualified immunity.  See Kelly v. Borough of
Carlisle, 622 F.3d 248, 253 (3d Cir. 2010).  The Court also need not determine whether
Defendants were acting under color of state law when they submitted the referrals or witness
statements, but instead will assume they were.

an active part in the prosecution after learning there is no probable cause for believing the accused is guilty. Rest. (2d) of Torts § 655, cmt. c.

No Delaware court has endorsed this approach. Moreover, according to the Restatement, aiding the prosecution or appearing as a witness is not sufficient to impose liability. <u>See id.</u> Rather, the alleged malicious prosecutor must actively insist on or urge the prosecution. <u>Id.</u> Although Wooleyhan has offered sufficient evidence as to Jester, he has not shown any evidence in the record that either White or Walsh engaged in such conduct. At most, their statements or reports, even if false in part and assuming Matt relied on them, may have contributed to the decision to continue the prosecution. But contributing to the decision to prosecute falls far short of insisting on or urging the prosecution. With respect to Jester, Wooleyhan points to evidence in the record that Jester allegedly falsely accused Wooleyhan, reported the allegedly false accusation to Matt, and requested Matt arrest and prosecute Wooleyhan. For these reasons, White and Walsh are entitled to summary judgment on this claim, but Jester is not.

### 3.    § 1983 Unlawful Detention

Of this group of Defendants, Wooleyhan asserts this claim against Jester only. Jester claims she did not detain Wooleyhan and, even if she had, school officials are permitted to detain students pending investigations. Wooleyhan counters that her false accusation served as the indirect cause of Wooleyhan's ultimate restraint, so she should be liable for unlawful detention.

The Court identified the elements of this claim above. The issues in this case are whether Jester was acting under color of state law and whether she can be liable for indirectly causing an officer to detain Wooleyhan. The Court has found no Supreme Court or Third Circuit precedent, and the parties have offered none, which suggest dispositive answers to these questions. The

Seventh Circuit, however, has held that a city employee may be liable for providing false information to the police as the basis for arresting the plaintiff, see Yeskigian v. Nappi, 900 F.2d 101, 104 (7th Cir. 1990), so long as the employee contacted the police and requested the arrest, see Berry v. Lindemann, No. 00-5540, 2006 WL 2536683, at *2-3 (N.D. Ill. Aug. 31, 2006).  In Yeskigian, the Seventh Circuit found liability only after first finding action under color of state law.  In particular, the court relied on the fact that the supervisor abused or misused his supervisory authority over the plaintiff to make a false statement to the police.  Yeskigian, 900 F.2d at 104; see Berry, 2006 WL 2536683, at *2-3.

At least two district courts in this Circuit have recognized this theory for § 1983 liability. See Monroe v. Mullooley, No. 10-1208, 2011 WL 337333, at *2 (W.D. Pa. Feb. 3, 2011) (concluding prison employee could be liable for unlawful detention based on allegedly false report resulting in detention of plaintiff); Strohl v. Litchko, No. 86-4577, 1986 WL 15012, at *1 (E.D. Pa. Dec. 29, 1986) (finding social worker could be liable under § 1983 for providing false statements to police for purpose of depriving plaintiff of his freedom) (citing Jennings v. Shuman, 567 F.2d 1213, 1220 (3d Cir. 1977)).

By arguing that, as a school teacher, she had authority to detain Wooleyhan pending an investigation and that she is required by state law to report an alleged offensive touching, Jester concedes that she was acting pursuant to her authority as a school teacher.  (Jester Memo. at 11-13 (citing Del. Code Ann. tit. 14, § 4112)); see Mangold v. Albert Gallatin Area Sch. Dist., 438 F.2d 1194, 1195 n.1 (3d Cir. 1971) ("Action of school authorities in their official capacities is

clearly state action within the meaning of the fourteenth amendment.").[19]  The Court is not

concerned with whether she exceeded her authority, but whether she abused or misused her

authority.  See Mark v. Borough of Hatboro, 51 F.3d 1137, 1150 (3d Cir. 1995); see also

Yeskigian, 900 F.2d at 104 ("The fact that these city employees may have acted in excess of their

authority is irrelevant to the color of law inquiry.").

This claim is contingent on the truth or falsity of Jester's accusation against Wooleyhan,

which is material and genuinely disputed.  Therefore, summary judgment is inappropriate on this

claim.

### 4.        State False Imprisonment

Of this group of Defendants, Wooleyhan asserts this claim against Jester only.  Jester

claims she did not detain Wooleyhan and, even if she had, school officials are permitted to detain

students pending investigations.  Wooleyhan counters that her false accusation served as the

indirect cause of Wooleyhan's ultimate restraint, so she should be liable for false imprisonment.

Jester cannot be liable under Delaware law for false imprisonment as a matter of law.  A

private citizen who initiates a criminal prosecution is not subject to suit for false arrest or false

imprisonment in Delaware unless he or she actively participated in the service of the warrant.

Shaffer, 1990 WL 81892, at *2.  Instead, the proper cause of action is malicious prosecution.  Id.;

see Simmons v. Truitt, No. 09-07-025, 2009 WL 3531799, at *5 (Del. Super. Ct. Oct. 20, 2009).

There is no evidence in the record that Jester actively participated in the service of an arrest

warrant or Matt's issuance of a criminal summons to Wooleyhan.  Therefore, she is entitled to

---

[19]        If the defendant's conduct satisfies the state action requirement of the Due Process
Clause, then it also qualifies as state action "under color of state law" for § 1983 purposes.  See
Abbott v. Latshaw, 164 F.3d 141, 145 (3d Cir. 1998).

summary judgment on this claim.

### 5.    § 1983 Procedural Due Process

Wooleyhan asserts a § 1983 claim for violation of procedural due process against Jester, White, and Walsh. But he does not rely on the same protected interest as he did against Yore, Mrazeck, and Maull. Instead, he contends Jester, White, and Walsh violated his right to be free from false accusations. Defendants assert no such right exists.

Wooleyhan cites Hill v. Borough of Kutztown in support of the right to be free from false accusations. 455 F.3d 225 (3d Cir. 2006). But Hill was a procedural due process case regarding a liberty interest in reputation – it did not create a right to be free from false accusations. Id. at 238. Thus, in the absence of any precedent supporting a claim of false accusation as an independent basis for a procedural due process claim, the Court will grant these Defendants' Motions for Summary Judgment on this claim.

Construed as a liberty interest in reputation claim, Wooleyhan must show stigma to reputation plus deprivation of some additional right or interest. See Dee v. Borough of Dunmore, 549 F.3d 225, 233-34 (3d Cir. 2008). The stigma prong is satisfied if the statement was (1) public and (2) false. See id.; Fraternal Order of Police, Lodge No. 5 v. Tucker, 868 F.2d 74, 82-83 (3d Cir. 1989). In this case, Wooleyhan alleges that Jester, White, and Walsh published false accusations against him to Matt and school administrators.

The "plus" prong cannot be satisfied by financial harm alone; rather, the plaintiff must allege the alteration or extinguishment of some additional interest created by state law. See Sturm, 835 F.2d at 1012-13. Wooleyhan contends his right to a public education is a sufficient property interest and, as indicated above, Delaware law creates this right. Therefore, the question

-39-

becomes whether Jester, White, and Walsh altered or extinguished this right.

The Court previously concluded there is no dispute of fact that Jester, White, and Walsh did not participate in the School's disciplinary process. Accordingly, Jester, White, and Walsh cannot be liable for this claim.[20] See Rode, 845 F.2d at 1207 (requiring personal involvement).

### 6.    Intentional Infliction of Emotional Distress

The Court previously summarized the relevant law for this claim. Wooleyhan alleges the following extreme and outrageous conduct against Jester: making knowingly false accusations and offering false testimony; physically separating Wooleyhan and his girlfriend; requesting prosecution; attempting to coerce an apology; making inappropriate comments; and erroneously listing Walsh as a co-referring teacher. Under Barker, Wooleyhan cannot assert defamatory communications as the basis for an IIED claim, which eliminates the allegedly false accusation and testimony. Reasonable people could not disagree that the remaining conduct simply does not rise to the level of extreme and outrageous conduct beyond all bounds of decency. The alleged conduct reveals poor judgment, insults, indignities, or annoyances, but did not create atrocious or intolerable conditions.

Wooleyhan alleges White committed IIED by offering false statements and false testimony and he claims IIED against Walsh for his false statements and his failure to disclaim Jester's referral. However, Barker precludes IIED liability for false statements, and failure to take action in light of another's allegedly extreme and outrageous conduct does not constitute extreme and outrageous conduct itself. See Collins, 2006 WL 1579828, at *10. Accordingly,

---

[20]       Also, because Wooleyhan cannot show a violation of a constitutional right in support of this claim, Jester, White, and Walsh are entitled to qualified immunity. See Kelly, 622 F.3d at 253.

Jester, White, and Walsh are entitled to summary judgment on the IIED claim.

### 7. § 1983 Invasion of Privacy

White claims Wooleyhan's privacy claim fails because she did not disclose his suspension and his arrest was not private information. Wooleyhan responds that White is liable for revealing private information – his arrest and suspension – to her class.

When the underlying claim for § 1983 is invasion of privacy, the complaint must be limited to those rights of privacy which are fundamental or implicit in the concept of ordered liberty. Doe v. SEPTA, 72 F.3d 1133, 1137 (3d Cir. 1995). The constitutional right to privacy is significantly narrower than the right of privacy protected by state tort law, and state law does not define constitutional standards. Nunez v. Pachman, 578 F.3d 228, 232 (3d Cir. 2009). The right to privacy encompasses two spheres: (1) the interest in independence in making certain decisions, and (2) the interest in avoiding disclosure of personal information. Doe, 72 F.3d at 1138. This case implicates the latter.

In determining whether information is entitled to privacy protection, courts consider whether it is within an individual's reasonable expectation of confidentiality. Paul P. ex rel. Laura L. v. Verniero, 170 F.3d 396, 401 (3d Cir. 1999). Courts agree that arrest records and related information are not protected. Sheetz v. Morning Call, Inc., 946 F.2d 202, 206 (3d Cir. 1991) (citing Paul v. Davis, 424 U.S. 693 (1976)); see Fraternal Order of Police Lodge No. 5 v. City of Philadelphia , 812 F.2d 105, 117 & n.8 (3d Cir. 1987) (noting arrest records are public information); Trade Waste Mgmt. Ass'n v. Hughey, 780 F.2d 221, 234 (3d Cir. 1985) (stating pending criminal charges are by definition public and, therefore, not protected). Further, there is no reputation interest or injury resulting from dissemination of criminal acts. Nunez, 578 F.3d at

233 n.15 (citing <u>Holman v. Cent. Ark. Broadcasting Co.</u>, 610 F.2d 542, 544 (8th Cir. 1979)).

Wooleyhan contends that two published statements by White disclosed his arrest and suspension in violation of his right to privacy. The first, a text message of White's statement to her class, only mentions his arrest and says nothing about his suspension. (Sealed App. at 110.) The second statement, White's report after the incident, says nothing about Wooleyhan's suspension. (Pl.'s School Defs. App. at 146.) Wooleyhan points to nothing else in the record to support this claim. Disclosure of his arrest is not actionable under the Constitution and, even assuming his suspension is a private matter, there is no evidence in the record suggesting White published that fact. Accordingly, the Court will grant White summary judgment on this claim.

### 8. Abuse of Process

The Court previously set out and explained the elements for a claim of abuse of process in Delaware. Jester contends she is entitled to summary judgment on this claim because she never requested an apology and Wooleyhan only heard of any request after his criminal trial. Wooleyhan responds that Jester requested an apology to insulate herself from criminal charges or administrative repercussions.

There is no factual support for Wooleyhan's claim that Jester requested an apology in exchange for dropping the charges. According to Wooleyhan's mother, "Mr. Yore asked for [Wooleyhan]'s apology. And he said, you know, it's a matter of perception. So my inference to that would be he felt [Wooleyhan] was guilty. He wanted an apology out of [Wooleyhan]." (Pl.'s School Defs. App. at 104.) First, this testimony suggests nothing about an exchange; second, it suggests Yore wanted the apology, not Jester; third, it is based on Wooleyhan's mother's own inference, i.e. speculation, which is not sufficient on summary judgment. <u>See</u>

Ridgewood Bd. of Educ., 172 F.3d at 252 (noting that speculative and conclusory allegations do not satisfy non-moving party's burden on summary judgment). She also testified that "other actions let me know they felt [Wooleyhan] owed an apology," but she does not identify these "other actions" or "they." (Pl.'s School Defs. App. at 104.)

Further, during a conversation between Yore and Jester, Jester said that if anyone deserved an apology it was her, but Yore said there was never any discussion of an exchange. (Pl.'s Jester App. at 18-19.) In her deposition, Jester denies requesting an apology, denies any exchange, and denies Yore tried to broker an apology. (Pl.'s Jester App. at 8.) Indeed, Jester testified that she wanted the charges pursued. (See Jester App. at 101; Pl.'s Jester App. at 13.)

Even construing Jester's statement to Yore as an apology request, there is no evidence of an ulterior motive or collateral advantage, and no evidence of a threat or objective not part of the process. Wooleyhan's only support for Jester's alleged motive is his expert's theory with no foundation in the facts of this case. Meadows v. Anchor Longwall & Rebuild, Inc., 306 F. App'x 781, 790 (3d Cir. 2009) (stating district court may properly exclude expert testimony lacking foundation in facts of case); (see Pl.'s Jester App. at 40 ("[I]n my opinion, defendant Jester may have realized that she'd gone too far . . . and/or might be subject to discipline by her superiors.")). Even if admissible, it is speculative and insufficient to defeat summary judgment. See Ridgewood Bd. of Educ., 172 F.3d at 252.

For these reasons, Jester is entitled to summary judgment on the abuse of process claim.

### 9. Defamation

Wooleyhan asserts this claim against Jester and White. Jester claims she only disclosed Wooleyhan's alleged conduct to Matt, which is conditionally privileged as a report to law

enforcement.  White contends she cannot be liable for defamation because her statement does not suggest Wooleyhan physically contacted Jester and the basis for the claim is inadmissible hearsay.  Wooleyhan argues Jester's asserted privilege does not apply to knowingly false statements.  As for his claim against White, Wooleyhan contends that the alleged text message may be considered as evidence if the declarant testifies in court, and White's written statement alleging Wooleyhan pushed out his elbow toward Jester is defamatory.

A claim for defamation in Delaware requires: (1) a defamatory communication; (2) publication; (3) the communication refers to the plaintiff; (4) the party receiving the communication understands its defamatory nature; and (5) injury.  Bloss v. Kershner, No. 93-04-282, 2000 WL 303342, at *6 (Del. Super. Ct. Mar. 9, 2000).  The plaintiff need not show special damages if he can show the communication is defamatory per se, such as by showing the communication imputes a crime.  Id.; see Spence v. Funk, 396 A.2d 967, 969 n.1 (Del. 1978).

Whether a statement is defamatory is a question of law.  John Doe No. 1 v. Cahill, 884 A.2d 451, 464 (Del. 2005).  Only if the court determines that the words are capable of a defamatory meaning may a jury consider whether such meaning is to be ascribed to the words.  Riley v. Moyed, 529 A.2d 248, 253 (Del. 1987).  A statement is defamatory if it lowers the plaintiff in the estimation of the community, deters others from associating or dealing with him, or injures his reputation in the popular sense.  Id.

Not all defamation is actionable – some defamation may fall within a class which the law terms privileged, for which no damages may be recovered.  Pierce v. Burns, 185 A.2d 477, 479 (Del. 1962).  Privilege can be either absolute (for judicial or legislative proceedings) or conditional.  Id.  A conditional privilege may be lost if it is abused by making a statement which

the speaker knows is false.  Id.  The court determines whether the privilege applies, and the jury resolves contested factual issues of whether the privilege was abused.  Id. at 480; Meades v. Wilmington Hous. Auth., No. 376, 2005 WL 1131112, at *2 (Del. May 12, 2005).

The conditional privilege implicated in this case immunizes statements to law enforcement officers.  See Meades v. Wilmington Hous. Auth., No. 03-05-013, 2004 WL 1732283, at *3 (Del. Super. Ct. July 30, 2004) ("[T]here is a conditional privilege to rely upon information when the information affects a sufficient important public interest and the public interest requires communication of a defamatory matter to a public officer who is authorized to take action if the defamatory matter is true."), rev'd on other grounds, 2005 WL 1131112.

Jester argues that she is entitled to this privilege for reporting the crime to Matt, but there is a dispute of fact as to the veracity of Jester's accusation.  If the jury concludes it was knowingly false, it could also conclude she abused the privilege.  Therefore, Jester's request for summary judgment will be denied as to this claim.

White argues that her statement did not impute a crime and that Wooleyhan's claim is based on inadmissible hearsay.  When the party claiming defamation relies on an out-of-court statement, an issue of hearsay may arise.  Generally, inadmissible evidence can be considered on summary judgment so long as it is capable of being presented in an admissible form at trial.  See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1234 n.9 (3d Cir. 1993); J.F. Feeser, Inc. v. Serv-a-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990).  For a defamation claim, the plaintiff must be able to introduce at trial the testimony of the person who directly heard the statement.  See Burch v. WDAS AM/FM, No. 00-4852, 2002 WL 1471703, at *13 (E.D. Pa. June 28, 2002); Wood v. Cohen, Nos. 96-3707, 97-1548, 1998 WL 88387, at *12

(E.D. Pa. Mar. 2, 1998). Consequently, the testimony of a person who received notice of the defamatory statement from another is not sufficient. Further, summary judgment is appropriate if the witness who directly heard the defamatory statement disavows hearing it before trial. <u>Nichols v. Bennett Protective & Detective Agency, Inc.</u>, 245 F. App'x 224, 228 n.3 (3d Cir. 2007).

Wooleyhan relies on a text message sent by a student in White's class, but that student disavows sending the message. (School Defs. App. at 72.) Unless Wooleyhan obtains admissible evidence of White's statement, the Court will exclude this evidence. Wooleyhan does rely on White's written statement that Wooleyhan "pushed [his] elbow out toward" Jester. (Sealed App. at 117-18.) Although White contends this does not impute a crime, the Court must construe the statement according to its plain and ordinary meaning. So construed, the statement is capable of imputing an attempted crime. <u>See</u> Del. Code Ann. tit. 11, § 531 (criminalizing attempts to commit a crime). A jury must resolve whether White's statement is false and whether it is defamatory. Accordingly, summary judgment is inappropriate on this claim.

### D. Qualified Immunity

The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established constitutional or statutory rights of which a reasonable person would have known. <u>Kelly v. Borough of Carlisle</u>, 622 F.3d 248, 253 (3d Cir. 2010). Thus, the Court asks (1) whether the facts alleged by the plaintiff show the violation of a constitutional right, and (2) whether the law was clearly established at the time of the violation. <u>Id.</u> Trial judges are permitted to exercise their sound discretion in deciding which of the two prongs of qualified immunity analysis should be addressed first in light of the circumstances of the case at hand. <u>See id.</u> (citing <u>Pearson v. Callahan</u>, 555 U.S. 223 (2009)).

The relevant dispositive inquiry regarding the clearly-established prong is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Id. at 253. This analysis must be undertaken in light of the specific context of the particular case and with regard to each asserted right. Id. Whether an officer acted reasonably is a question of law. Bartholomew v. Pennsylvania, 221 F.3d 425, 428 (3d Cir. 2000). But the jury must determine disputed historical facts material to the qualified immunity question. Miller v. DiGuglielmo, No. 07-2686, 2010 WL 4909589, at *16 (E.D. Pa. Nov. 30, 2010) (Baylson, J.); see also Forbes v. Twp. of Lower Merion, 313 F.3d 144, 146 (3d Cir. 2002) (requiring district courts to identify the disputed and undisputed material facts when qualified immunity is denied on that basis).

To decide whether a right is clearly established, a court must consider the state of the existing law at the time of the alleged violation and the circumstances confronting the officer to determine whether a reasonable state actor could have believed his conduct was lawful. Kelly, 622 F.3d at 253. It is not necessary that the exact set of factual circumstances has been considered previously; officials can still be on notice that their conduct violates established law even in novel factual circumstances so long as the law gave the defendant "fair warning" that the conduct was unconstitutional. Id. at 259-60; see Burns v. Pa. Dep't of Corr., __ F.3d __, No. 09-2872, 2011 WL 1486075, at *10 (3d Cir. Apr. 20, 2011). Such a finding need not be based on Supreme Court or Circuit case law. See Kelly, 622 F.3d at 260.

"Some but not precise factual correspondence to precedent [is] required." Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 726 (3d Cir. 1989) (quotations omitted). The Third Circuit has adopted a broad view of what constitutes an established right of which a reasonable

person would have known.  Id.  A court must undertake an inquiry into general legal principles

governing analogous factual situations, if any, and a subsequent determination whether the

official should have related this established law to the instant situation.  Id.  The contours of the

right must be sufficiently clear so that a reasonable official would understand that what he is

doing violates the right.  Burns v. County of Cambria, 971 F.2d 1015, 1024 (3d Cir. 1992).

### 1.   Matt

Matt is entitled to qualified immunity for Wooleyhan's federal malicious prosecution and

unlawful detention claims.  Matt received a reliable identification from the victim of an alleged

offensive touching.  Wooleyhan alleges no facts to suggest Matt knew Jester was unreliable.  Nor

does he offer plainly exculpatory evidence available to Matt at the time.  Instead, Wooleyhan

propounds his denial of Jester's accusation, as well as testimony from two other witnesses who

claim he did not elbow Jester.  Finally, he presents a video which neither inculpates nor

exculpates him.

Based on this evidence, the Court cannot conclude that a reasonable police officer would

think arresting Wooleyhan was unlawful.  In these circumstances, an officer would have no duty

to further investigate Jester's accusation and, even if he had, would not reasonably believe he did

not have probable cause to arrest Wooleyhan, despite conflicting accounts.  Therefore, Matt is

entitled to qualified immunity on this claim.[21]  See Mitchell, 134 F. App'x at 551 (concluding

police officer who relied solely on victim's statements to procure arrest warrant was entitled to

qualified immunity, even though he could have investigated further or been more skeptical of

---

[21]      Because Matt had probable cause or is otherwise entitled to qualified immunity,
the Court will not consider his alternative argument for prosecutorial immunity.

victim's allegations).

### 2. Yore, Mrazeck, and Maull

The Court acknowledged above that a genuine dispute of material fact exists regarding whether these Defendants gave Wooleyhan sufficient notice of the accusations against him. Regardless, they did advise his parents of the basis for the suspension on the day of the incident and at subsequent meetings. (Pl.'s School Defs. App. at 102-03, 105, 154-55, 165.)

"Here, the question is 'whether reasonable officials in [Yore's, Mrazeck's, and Maull's] position[s], with the information then available to [them], should have known that their actions [in providing notice to Wooleyhan's parents on the day of the incident and at subsequent meetings with Wooleyhan and his parents] violated clearly established federal law." Burns, 2011 WL 1486075 at *11. The law is clear that a student facing a suspension of ten days or less is entitled to notice of the charges and an opportunity to respond. Goss, 419 U.S. at 581. Goss also stated this notice could be provided soon after the conduct in question, but should be provided prior to the student's removal except in limited circumstances. Id. at 582. It is not clear, however, that school officials violate due process if they provide notice to the student's parents on the day of the incident and then again to the student and his parents in subsequent meetings. Cf. Burns, 2011 WL 1486075, at *12 (suggesting officials could reasonably believe a necessary hearing was also a sufficient hearing even though conducted later in time). Accordingly, the Court concludes that a reasonable official would not know that such conduct violated procedural due process, and Yore, Mrazeck, and Maull are entitled to qualified immunity on the procedural due process claim.

### 3.      Jester

Jester is not entitled to qualified immunity for Wooleyhan's only remaining federal law claim against her – unlawful detention.  The right to be free from false arrest is a clearly established right, which necessarily includes the right to be free from false accusations in obtaining the authority to arrest.  See Lippay v. Christos, 996 F.2d 1490, 1502, 1504 (3d Cir. 1993).  The Seventh Circuit extended this to any supervisory state official who makes a false accusation to the police, Yeskigian, 900 F.2d at 104, so long as the official contacted the police and requested arrest, see Berry, 2006 WL 2536683, at *2-3; see also Monroe, 2011 WL 337333, at *2 (concluding prison employee could be liable for unlawful detention based on allegedly false report resulting in detention of plaintiff); Strohl, 1986 WL 15012, at *1 (finding social worker could be liable under § 1983 for providing false statements to police for purpose of depriving plaintiff of his freedom).

In addition, a genuine dispute of material fact exists precluding a finding of qualified immunity on summary judgment – whether Jester falsely accused Wooleyhan.  Because Jester allegedly requested Matt to arrest and prosecute Wooleyhan, she may be liable if the accusation was false.  No state actor could reasonably believe that making a false accusation to procure a student's arrest is lawful under the circumstances of this case.  Accordingly, Jester is not entitled to qualified immunity.

### E.      Punitive Damages and Injunctive Relief

In light of the foregoing conclusions, the only remaining claims against the individual Defendants are: unlawful detention under federal law against Jester, state malicious prosecution against Jester, and defamation against Jester and White.  Defendants argue that their alleged

conduct is not sufficiently egregious to justify punitive damages under federal or Delaware law. The teachers and administrators, other than Jester, also argue that injunctive relief is inappropriate because there is no risk of future harm in light of Wooleyhan's graduation.

Under federal law, punitive damages may be awarded against a state actor in his or her individual capacity. Smith v. Wade, 461 U.S. 30, 56 (1983); City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 267 n.13 (1981). The party seeking punitive damages must show the defendant's conduct was motivated by an evil motive or intent, or that the conduct involved reckless and callous indifference to the federally protected rights of others. Smith, 461 U.S. at 56. Reckless indifference refers to a defendant's knowledge that he may be acting in violation of federal law. Alexander v. Riga, 208 F.3d 419, 431 (3d Cir. 2000). The standard focuses on the defendant's state of mind, and the existence of a federally protected right does not guarantee eligibility for punitive damages. Whittaker v. Fayette County, 65 F. App'x 387, 393 (3d Cir. 2003). The appropriateness of punitive damages in light of the alleged conduct is a question of fact for the jury to resolve. Malone v. Econ. Borough Mun. Auth., 669 F. Supp. 2d 582, 612 (W.D. Pa. 2009).

Wooleyhan seeks punitive damages against Jester because she violently separated him and his girlfriend, falsely reported a crime, made inappropriate comments, requested prosecution, and falsely claimed Walsh and White as witnesses. The Court concludes there is a genuine dispute of material fact regarding the veracity of Jester's accusation and whether that conduct is sufficiently egregious. Accordingly, the Court will not dismiss Wooleyhan's claim for punitive damages against Jester.

Punitive damages are recoverable under Delaware law when the defendant's conduct

exhibits a wanton or willful disregard for the rights of the plaintiff.  Cloroben Chem. Corp. v. Comegys, 464 A.2d 887, 891 (Del. 1983).  For the defendant's conduct to be wanton or willful, it must reflect a conscious indifference or an "I don't care" attitude.  Id.  Punitive damages serve a dual purpose – to punish wrongdoers and to deter others from similar conduct.  Jardel Co. v. Hughes, 523 A.2d 518, 529 (Del. 1987).  The penal aspect and policy considerations require that punitive damages be imposed only after a close examination of whether the defendant's conduct was outrageous because of an evil motive or reckless indifference to the rights of others.  Id.  The defendant's decision must be more than wrong; it must result from a conscious indifference to the decision's foreseeable effect and the defendant must foresee that his unacceptable conduct threatens particular harm to the plaintiff.  Id.

Jester's request for summary judgment will be denied because there is a genuine dispute of material fact whether her accusation was false, and it is for the jury to determine whether she exhibited conscious indifference in making the accusation.  As for White, the only basis for Wooleyhan's defamation claim is her written statement that she saw him "push his elbow out toward" Jester.  (Sealed App. at 117-18.)  The Court will deny White's request for summary judgment because there exists a genuine dispute whether she witnessed the event and, therefore, the jury must determine whether she exhibited conscious indifference by accusing Wooleyhan of conduct she did not even witness.

None of the injunctive relief Wooleyhan requests pertains to White in her individual capacity.  The Court will grant White summary judgment with regard to this requested relief.

## IV. Conclusion

Having applied binding precedent and construed the evidence in the light most favorable to Wooleyhan, and without placing any blame or taking sides, the Court has decided the Defendants' Motions for Summary Judgment. This case has consumed significant time and energy for all of the parties and their counsel since the incident. Any third party observer must wonder how and why a relatively simple incident, which lasted a few seconds, in a high school hallway has "morphed" into complex federal litigation.

Now that the dispute has resulted in the Motions for Summary Judgment and this Court's decision, the parties must decide what the future course of this litigation will be. No one can know for certain how a jury will assess this case, but that should be the concern of the parties. One must wonder whether further pretrial proceedings, additional motions for summary judgment, and a possibly lengthy jury trial are the best answer.

The arrest and prosecution of a high school student, arising out of the student's alleged conduct vis-a-vis a teacher, without any connection to guns, drugs or serious bodily injury, is, to say the least, unusual. A jury may question why standard school discipline was not sufficient for the specific infraction alleged against Wooleyhan. Cf. Merkle, 211 F.3d at 795 (characterizing arrest of school teacher for stealing school supplies to donate to local community center as "shocking," "especially when there were less oppressive options" and "reasonable alternatives" available for discipline).

Wooleyhan obviously feels strongly, and his feelings are not irrational. Having been arrested and prosecuted, and acquitted, Wooleyhan, as any similarly situated individual, has a right to seek damages if Defendants acted wrongfully.

However, as this Memorandum shows, settled legal principles must govern this case rather than any sense of revenge or "getting even."  Under those principles, Wooleyhan has no assurance that there will be a recovery, and the remaining Defendants cannot be sure they will prevail.  The Court encourages the parties to seek a resolution of this case through realistic settlement discussions with Magistrate Judge Strawbridge, a mediator selected by the parties, or an agreement to binding arbitration.

For the foregoing reasons, Matt's Motion for Summary Judgment is **granted** in part and **denied** in part; Jester's Motion for Summary Judgment is **granted** in part and **denied** in part; and the remaining School Defendants' Motion for Summary Judgment is **granted** in part and **denied** in part.  All individual capacity claims against Matt, Yore, Mrazeck, Maull, and Walsh are dismissed.  All individual capacity claims against Jester and White are dismissed, except for the § 1983 unlawful detention claim against Jester, the state malicious prosecution claim against Jester, and the defamation claims against Jester and White.

An appropriate Order will follow.